**File Name: 06a0574n.06**

**Filed: August 10, 2006NOT RECOMMENDED FOR
FULL-TEXT PUBLICATION**

No: 05-2178

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff - Appellee*

                                     On Appeal from the United States District
                                     Court for the Western District of Michigan
         v.                               Southern Division

KEVIN IKE OBI,
    *Defendant - Appellant*

                             /

**BEFORE: KENNEDY, COLE, Circuit Judges; and VARLAN, District Judge.**[*]

**KENNEDY, Circuit Judge.** Defendant Kevin Ike Obi appeals his sentence of three hundred (300) months imprisonment. On appeal, defendant argues: 1) the district court erred in enhancing his sentence by two levels pursuant to U.S.S.G.§ 3C1.1 for obstruction of justice; and, 2) his sentence is unreasonable in violation of *United States v. Booker*, 543 U.S. 220, 261 (2005). For the following reasons we **VACATE** the defendant's sentence and **REMAND** for resentencing.

**BACKGROUND**

On April 14, 2004, Kevin Ike Obi ("Obi") was arrested by officers from the Kent Narcotics Enforcement Team (KNET) for delivering 20 packets of heroin. A day later, Obi entered into a

---

[*]The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

written cooperation agreement whereby he aided officers by performing controlled buys of drugs. In April and May of 2004, Obi assisted with several such controlled buys. Yet, during the summer of 2004, Obi violated his cooperation agreement by continuing to buy and sell heroin on his own account. In August of 2004, the Drug Enforcement Administration ("DEA") received information indicating that Obi was continuing to sell heroin.

On September 3, 2004, Obi and Terry Ensing went to a bar in Grand Rapids, Michigan, to join up with two women, Crystal Brow and Nora Lares. At one point Obi and Ensing left the bar but they later returned and remained at the bar with Brow and Lares until the bar closed. Lares and Brow were both drinking. Lares consumed so much alcohol that she appeared visibly drunk. Brow was on the verge of passing out when she exited the bar and she vomited outside the bar. Obi acknowledged that he was aware of the inebriated state of the women.

Around 2:47 a.m., all four individuals went to Obi's basement where Obi began preparing lines of heroin for himself, Ensing, and Lares. Brow lost consciousness shortly after arriving at Obi's home. According to Ensing, Lares suspected that the substance was something other than cocaine and "asked Obi whether heroin was Oxy [Oxycontin]. Obi responded that it was not Oxy, but did not affirmatively tell Lares that it was heroin." JA at 228. Obi, Lares and Ensing then snorted the heroin.

As Brow was still passed out, Ensing and Obi carried her to another room so that Obi could have sexual intercourse with Lares. While Obi was having sexual intercourse, Ensing went upstairs. According to Ensing's description of the events, "sometime after he left Lares and Obi alone, Obi came upstairs and told him that Lares wanted to have sex with Ensing. Obi also mentioned something to him about thinking that Lares had stopped breathing but then she was ma[king] snoring

2

sounds." JA at 228. Ensing then went downstairs and proceeded to engage in sexual intercourse with the unconscious Lares during which, at some point, he discovered that she was not just unconscious, but that she was also not breathing. Ensing then informed Obi of the situation.

Obi and Ensing did not immediately contact 911 emergency services. Instead, they dressed Lares, carried her upstairs, loaded her into Obi's mother's sport utility vehicle, and drove her to a local medical center. The medical center was closed. At this point, Obi finally called 911.

Several minutes after the call, around 4:00 a.m., emergency responders arrived at the car outside the medical center. Sometime prior to their arrival Obi had attempted to clean his semen from Lare's body. Obi and Ensing told the local police that they had not used drugs that night nor had they observed Lares using drugs. Lares was pronounced dead at 4:51 a.m. An autopsy later revealed she died from a lethal amount of morphine derived from heroin.

The officers went back to Obi's home accompanied by Obi to attend to Crystal Brow, who had to be revived, and they made arrangements for her to be transported to the hospital. The officers conducted a cursory search of the home but did not find evidence indicating drug use. Obi was also taken to the hospital for what he thought was a panic attack and he was subsequently admitted to a mental health facility.

The local police referred this case to federal agents with the DEA. On September 8, 2004, four days after Lares' death, the DEA agents executed a search warrant to again search Obi's basement apartment. By this point, Obi's mother had thoroughly cleaned the residence, discarding the bedding and trash. Obi's mother claimed that she cleaned the basement because the grief counselor working with Obi said that the visual reminders would adversely affect him. Despite the

3

cleaning, investigators were still able to find some well hidden heroin-related contraband above the ceiling tiles, such as syringes and suspected heroin paper folds.

Several weeks after the search of Obi's basement apartment, federal investigators interviewed two individuals who indicated that Obi had continued to sell heroin after Lares' death. On September 28, 2004, one individual admitted that he purchased heroin from Obi that day. On September 29, 2004, the DEA sought both a federal criminal complaint and a second search warrant for Obi's residence. While awaiting the issuance of the requested warrants, on September 29, 2004, the agents, while surveying Obi's residence, observed an individual enter Obi's home. That individual later admitted to buying heroin from Obi. When agents were informed that the warrants were issued, they executed the search warrant and arrested Obi on the criminal complaint.

Later, in a post-Miranda interview, Obi admitted that he started selling heroin in January of 2004 and that he was purchasing 1 to 3 grams of heroin several times a week in March and April of 2004. He further admitted that he was with Nora Lares the evening she died, that he had sex with her, and that she was at his home when she stopped breathing. Obi continued to deny that he provided her with drugs.

On October 13, 2004, a grand jury returned a two-count indictment charging Obi with conspiracy to distribute 100 grams or more of heroin and distribution of heroin to a person under 21 years of age.

The government continued to interview witnesses regarding the death of Nora Lares. Eventually, the government entered into a proffer agreement and subsequent plea agreement with Terry Ensing who confirmed that Obi provided heroin to Lares on September 4, 2004. With this

4

information, on November 17, 2004, the grand jury returned a superseding indictment adding a third count of distribution of heroin resulting in the death of Nora Lanes.

On February 18, 2005, Obi plead guilty to knowingly and intentionally distributing heroin resulting in the serious bodily injury and death of Nora Lares. Because of Obi's assistance, the government agreed to request the release of the minimum mandatory sentence (20 years) as part of his plea agreement. However, the government reserved the right to argue for a sentence above the mandatory minimum.

The district court held a sentencing hearing on July 7, 2005. At the hearing the court discussed the findings of the Presentence Investigation Report ("PSR"). The advisory guideline range as calculated in that report was 262-327 months with an offense level of 37 and a criminal history category of III. The court adjusted the offense level downward three levels because Obi accepted responsibility. The court also imposed a two level enhancement for obstruction of justice; Obi objected to this enhancement, but his objection was denied. The court granted the government's motion to release to twenty-year mandatory minimum but noted that it still had discretion to sentence in excess of that minimum.

After hearing final sentencing arguments, the court sentenced Obi to three hundred (300) months imprisonment. The court also ordered that Obi attend programs for substance abuse and mental health as well as the Bureau of Prisons 500 hour substance abuse program. Finally, the court imposed a restitution penalty in the amount of the funeral costs incurred by the Lares family. This timely appeal followed.

## ANALYSIS

### I. Obstruction of Justice Enhancement

5

Obi argues that the district court erred in finding he obstructed justice when he falsely stated to police officers that he did not use drugs and that he did not observe Nora Lares using drugs.[1] This court reviews factual findings for clear error, *United States v. Tucker*, 925 F.2d 990 (6th Cir. 1991), and a sentencing court's interpretation of the guidelines *de novo*, *United States v. Flowers*, 55 F.3d 218 (6th Cir. 1995).

The district court enhanced Obi's sentence by two levels pursuant to U.S.S.G. § 3C1.1, which states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Application Note 5(b) provides, "making false statements, not under oath, to law enforcement officers," should not be considered obstruction of justice unless Application Note 4(g) applies. Application Note 4(g) states that, "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" shall be considered obstruction of justice.

Obi first argues that he did not act with the requisite intent because he contends his obstructive act was not "willfully" done. U.S.S.G. § 3C1.1. As explained by this circuit, "[i]t has been said that the term "willful" has no fixed meaning," but the term "generally connotes some kind

---

[1]While the district court found that Obi also "lied about sex with the victim...at a time in which the police had to determine what the crime scene was" (JA at 182), there appears to be no indication from either the PSR or elsewhere in the record that Obi ever affirmatively denied having sex with Nora Lares. Thus, we limit our discussion to the impact of his false statement that neither he nor Nora Lares had used drugs that evening.

of deliberate or intentional conduct." *United States v. Brown*, 237 F.3d 625, 628 (6th Cir. 2001) (citation and quotation omitted). When Obi informed officers that he did not use drugs and that he did not see Nora Lares using drugs, Obi deliberately and intentionally lied to the officers. Thus, we find this argument is without merit**.**

Obi next argues that even if he acted willfully, he did not actually succeed in significantly impeding the investigation. This court has determined that the "attempt" language in U.S.S.G. § 3C1.1 does not apply to obstruction of justice found pursuant to Application Note 4(g) because Application 4(g) only applies to those statements that significantly impeded an investigation. *United States v. Jarman,* 44 F.3d 912, 914 (6th Cir. 1998) (noting that application notes to the Guidelines are given "controlling weight"). In interpreting Application Note 4(g) and Guideline § 3C1.1 we have explained:

> The focus of the guideline is on whether defendant, by actively making material false statements (and not by a passive refusal to cooperate), *succeeded* in significantly impeding the investigation. Failed attempts to shift the investigative searchlight elsewhere are not covered by the guidelines.

*United States v. Williams*, 952 F.2d 1504, 1516 (6th Cir. 1991). Thus, while obstruction covered by Note 4(g) does not require a showing that officers were ultimately led astray, it does require a showing that the defendant made a materially false statement to investigators and that the false statement significantly obstructed or impeded the investigation. In other words, simply lying to officers or attempting to lead them astray is not sufficient to justify an enhancement pursuant to Application 4(g). As explained by this circuit:

> Application Note 4(b) *specifically permits lies to investigating agents* provided they do not significantly obstruct or impede the investigation. Even if it could be accepted that defendant's false statements obstructed or impeded the investigation, something

7

by no means obvious, we do not believe that defendant's statements *significantly* obstructed or impeded the investigation.

*Williams*, 952 F.2d at 1516 (emphasis added). Again, "the crucial question is whether these false statements, not made under oath, 'significantly obstructed or impeded the official investigation of this case.'" *Id.* at 1515 (quoting U.S.S.G. § 3C1.1, Application 4(g)).

The government argues that Obi's false statement that neither he, nor Nora Lares, had used drugs significantly impeded their investigation by delaying their investigation which resulted in the loss of potential evidence. The government reasons: the false statement was made at a time when the investigators had to determine the location of the crime scene; because of Obi's lie, the police mistakenly treated Obi's vehicle rather than his residence as the crime scene; this mistake allegedly resulted in the loss of potential evidence of drug use; and, by the time investigators suspected a heroin overdose and went back to more thoroughly search Obi's residence, his residence had been cleaned.

Obi admits that he falsely stated to investigators that he had not used drugs and that he had not observed Nora Lares using drugs; however, he claims that this statement did not significantly impede the investigation. When asked by police if anyone was at his residence, Obi admitted that Crystal Brow was there. The police then went to his residence where they found Brow passed out and the officers had to revive her. JA at 225; PSR ¶ 32. An ambulance arrived at Obi's house to take Brow to the hospital to treat her for alcohol poisoning. The PSR states, "[o]ne of the police officers asked Mr. Obi if they had been using drugs, *stating that Ms. Brow stated they had been doing lines*," (JA at 228; PSR ¶ 46) (emphasis added). At oral argument the government argued that Brow could not have indicated this as she was "passed out" the entire time. As there was no objection to this allegation in the PSR, we accept it as true. *United States v. Levy,* 250 F.3d 1015, 1018 (6th Cir.

2001) (a court "is allowed to accept as true all factual allegations in a presentence report to which the defendant does not object"); *see also United States v. Ward,* 190 F.3d 483, 492 (6th Cir. 1999) (failure to object to the factual allegations in a presentence report waives any future objections). Further, we note that even though the facts in the PSR indicate that Brow passed out upon *arriving* at Obi's home, Paragraph 32 of the PSR states, "[p]olice went to Mr. Obi's home, *revived Ms. Brow*, and had her taken to the hospital." (emphasis added) JA at 225; PSR ¶ 32. Thus, the officers were put on notice that drugs were used that night.[2] The police even searched Obi's bedroom that night, although they did not find any drug paraphernalia or other evidence indicating a heroin overdose.

Just four days after Nora Lares death when the officers again searched Obi's residence, this time more thoroughly, they found the syringes and other evidence of heroin use. Because Obi's mother had cleaned the basement by this point, the government argues that valuable evidence was lost.[3] Notably, there is no indication that Obi ordered his mother to clean his residence; in fact, there was a representation by counsel, speaking as an officer of the court, that a counselor at the hospital

---

[2]The PSR is the only source of our and the district court's information as to what the police knew that night.

[3]The dissent argues that "forensic evidence was lost when the area was cleaned." Dissent Op. at 3. Yet, this is simply speculation. The government has the burden of proof and it has failed to explain what evidence was actually lost considering the officers, just four days later, found evidence of drug use. Even if Obi had not lied to the police, and the police had treated his basement apartment as the crime scene rather than the car, what evidence was it that would have been found? Admittedly, a thorough search would have yielded evidence of drug use that night. But this does not lead to the conclusion that the government says it does. The police would still need either a confession from Obi or Ensing's testimony to prove that it was Obi who gave the heroin to Ms. Lare. In sum, even if the officers found evidence of drug use that night, the government would not have more than it did after it found the syringes in the ceiling just four days later.

9

had recommended that Obi's mother clean up his room in order to minimize the visual impact that scene would have on him. More importantly, despite her cleaning, investigators still found heroin-related contraband above the ceiling tiles, such as syringes and suspected heroin paper folds.

The government was put on notice that drugs were used the night Nora Lares passed away, the government searched Obi's residence that night, and the government found heroin-related contraband in Obi's basement just four days after Lare's death. Thus, the government's argument seems to be that their investigation was "significantly impeded" essentially because it was delayed. Yet, in *Williams,* this court rejected a similar argument, stating:

> Indeed, it seems that the government's real argument is not that defendant succeeded in misleading anyone, but that his failure to confess and cooperate with the government when first approached required the government to continue an investigation that might otherwise have been shortened. This argument is not supported by any provision in section 3C1.1, and the government cites no authority for it.

*Williams*, 952 F.2d at 1515 -1516. The delay in this investigation was not so severe as to justify an obstruction of justice enhancement, especially in light of *Williams*. The government also argues that due to this delay some speculative evidence may have been lost. Unsupported allegations that evidence may have been lost do not justify an obstruction enhancement of two levels. Because we find the government cannot cite to any way in which their investigation was actually significantly impeded by Obi's statements, the district court's imposition of a two level enhancement for obstruction of justice was in error.

The guideline range with the obstruction of justice enhancement is 267-327 months; without this enhancement the range is 210-262 months. Obi was sentenced to 300 months imprisonment, obviously within the advisory range with the enhancement but significantly above the range without it. Even though we agree with the government that the district court considered the relevant 18

10

U.S.C. § 3553(a) factors, because the court also considered an improperly calculated guideline range, the defendant's sentence is **VACATED** and the case **REMANDED** to the district court for resentencing, consistent with this opinion.

**THOMAS A. VARLAN, dissenting**. Because the district court was not clearly erroneous in finding that the defendant significantly impeded the investigation, which supported its application of the § 3C1.1 enhancement for obstruction, I respectfully dissent.

The majority relies on three specific facts as establishing that the defendant delayed – rather than "actually significantly impeded" – the investigation into the circumstances surrounding the death of Ms. Lares. Specifically, the majority points to an alleged statement by Ms. Brow, a cursory search of the defendant's home on the night of Ms. Lares's death, and the discovered drug paraphernalia during a search four days after Ms. Lares's death. A close review of the record, however, indicates that these facts do not support a finding of clear error by the district court.

First, the majority construes the alleged Brow statement that "they had been doing lines," JA at 228, to conclude that the government was put on notice of drug use that night. This statement is drawn from one paragraph in the presentence investigation report (PSR) in which the PSR writer relates the defendant's version of events. The majority reasons that the statement should be accepted as true since the government did not object to it before sentencing. Read in context, however, the fact to be accepted as true is not that *Ms. Brow actually said* they had been doing lines; instead, the fact to be accepted as true is that the defendant told the PSR writer that a *police officer represented* to the defendant that such a statement had been made. There is no evidence that Ms. Brow ever actually made such a statement to police officers or that police officers believed such a statement had been made. Thus, even accepting the statement from the PSR as true, the defendant's statement to the PSR writer about what a police officer represented to the defendant about what Ms. Brow may or may not have said is not sufficiently definitive to put the government on notice of drug use that night.

12

Second, the majority points out that the government conducted a "cursory search" of the defendant's home the night of Ms. Lares's death. The significance of that fact in support of the majority's conclusion is diminished when its context is considered. After arriving at the defendant's vehicle to find a deceased Ms. Lares, officers, along with the defendant, returned to the defendant's home where they met emergency personnel, because the defendant had told them Ms. Brow was unconscious there. Thus, officers conducted a brief search in support of the emergency personnel's attempts to revive Ms. Brow, not as part of a crime scene investigation. Because the defendant had concealed some evidence of drugs already, *see* JA at 225, that cursory search did not yield any sign of drugs, except perhaps the alcohol Ms. Brow had consumed, and seemed to confirm the defendant's lie that the group had not used drugs that night. Consequently, precisely because defendant lied, officers did not treat the defendant's home as the crime scene that it really was until four days later, after the area had been cleaned.

Finally, the majority relies on the paraphernalia found four days later in the ceiling tiles of the defendant's home once investigators realized on their own that the defendant's home was the crime scene. The syringes and paper folds were found even though the area had been cleaned. The fact that the government found this evidence, however, does not change the fact that forensic evidence was lost when the area was cleaned.[4] While it may have been only four days since Ms.

[4] The majority characterizes this fact as speculation before acknowledging that "[a]dmittedly, a thorough search would have yielded evidence of drug use that night." Majority Op. at 9 n.3. The majority then excuses this fact by arguing "even if the officers found evidence of drug use that night, the government would not have more than it did after it found the syringes in the ceiling just four days later." *Id*. This is not the standard, however, for applying the enhancement at issue in this case. The application of § 3C1.1 does not require the government to demonstrate that it would have *more* evidence if the defendant had not obstructed the investigation. Instead, the government must demonstrate that its investigation was "significantly impeded." With that in mind, a district court is not clearly erroneous in concluding that the government has satisfied its burden by showing that

13

Lares's death, that was enough time to destroy any forensic evidence of drug use the night of Ms. Lares's death, leaving only paraphernalia, although there is no evidence that the paraphernalia was related to Ms. Lares's death or the events of that night. The four-day delay arose because the defendant lied to investigators, leading them to treat the vehicle as the crime scene and allowing enough time for the real crime scene to be unalterably changed.

Thus, the three facts relied upon by the majority indicate something more than just delay or attempts to impede the investigation and renders *United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991), distinguishable from the instant case. In *Williams*, an extortion case, the defendant's lie came toward the end of an investigation, was disbelieved by investigators, and merely required the government to gather some additional, cumulative evidence. *See* 952 F.2d at 1515-16. By contrast, in this case, involving a death, the defendant's lie came at the very outset of the investigation, it led the government to mistakenly treat the wrong location as the crime scene, which wasted investigative resources, and allowed the real crime scene to be cleansed of potential forensic evidence.

Because that forensic evidence was destroyed, the investigation was required to develop new evidence and ultimately became dependent on the testimony of witnesses, who faced their own criminal responsibility, and the paraphernalia found in the ceiling tiles. Just because the government was ultimately able to obtain this other evidence in support of its case does not negate the fact that the defendant's lie actually prevented investigators from correctly identifying and properly investigating the real crime scene. As the district court explained, the inability to properly identify

the defendant's false statement caused investigators to treat the wrong location as the crime scene, thereby resulting in the inalterable change of the true crime scene.

14

and investigate a crime scene is a significant impediment to an investigation. *See* JA at 181-83. Thus, at the very least, the district court was not clearly erroneous in concluding that the defendant's lie was sufficient to justify the enhancement because it led investigators to the wrong crime scene, which wasted their resources and permitted the real crime scene to be cleaned, thereby resulting in the loss of forensic evidence. *See United States v. Smart*, 41 F.3d 263, 264-65 (6th Cir. 1994) (citations omitted) (explaining "sentencing courts retain discretion in deciding whether a defendant's actions constitute an obstruction of justice under the guidelines" and that discretion is abused where there is a "definite and firm conviction that the trial court committed a clear error of judgment").

Because I would find that the district court was not clearly erroneous with regard to the § 3C1.1 enhancement, I would conclude that the district court properly calculated the advisory guideline range. Proceeding to a consideration of reasonableness under § 3553(a), I would conclude that the sentence was reasonable since the district court properly calculated the advisory guideline range, properly considered the relevant § 3553 factors, including the possible mitigating effect of one investigator's inappropriate conduct, and demonstrated that it did not adopt a categorical approach. Accordingly, I would affirm the district court's sentence.